1 | JESSICA K. PRIDE (SBN 249212)
jpride@pridelawfirm.com
2 | DANTE PRIDE (SBN 262362)
dpride@pridelawfirm.com
3 | CHANDLER TERAOKA (SBN 339498)
cteraoka@pridelawfirm.com
4 | THE PRIDE LAW FIRM
2831 Camino Del Rio S., Suite 104
5 | San Diego, CA 92108
Telephone: (619) 516-8166
6 | Facsimile: (619) 785-3414
Attorneys for Plaintiff
7

FILED

SEP 0 9 2022

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

8

## UNITED STATES DISTRICT COURT

9

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

10

**VKD**

11 | M.R.

CASE NO. **CV 22 - 51 37**

12 |        Plaintiff,

13 | v.

**COMPLAINT**

14 | FEDERAL CORRECTIONAL
INSTITUTION "FCI" DUBLIN;

**DEMAND FOR JURY TRIAL**

15 | ROSS KLINGER; RAY J. GARCIA;
and UNITED STATES OF
16 | AMERICA, a governmental entity,

17

18 |        Defendants.

19 | **INTRODUCTION**

20 |         1.     Beginning in approximately March 2020 and ending in approximately

21 | October 2020, Defendant Ross Klinger ("Klinger"), a correctional officer at Federal

22 | Correctional Institution – Dublin ("FCI Dublin"), repeatedly subjected Plaintiff, a

23 | minimum-security inmate incarcerated there, to sexual abuse in violation of federal

24 | and state law.

25 |         2.     Congress enacted the Prison Rape Elimination Act in 2003, 34 U.S.C.

26 | § 30301, *et seq.* ("PREA") to establish national standards for preventing precisely

27 | this kind of sexual abuse from happening to federal inmates. Under PREA, the U.S.

28 | Department of Justice promulgated detailed regulations that provide precise

1  procedures that prisons must follow. And the Federal Bureau of Prisons ("BOP")

2  adopted PREA policies in response to these regulations.

3      3.   Defendant Klinger, a correctional officer at FCI Dublin, repeatedly

4  subjected Plaintiff to sexual abuse. In doing so, Klinger violated Plaintiff's

5  Constitutional rights and California law on gender violence and sexual assault and

6  common law on battery and negligence. He currently faces federal criminal charges

7  for sexual abuse of a ward (18 U.S.C. § 2243(b)) for his abuse of Plaintiff and

8  another inmate. Klinger pled guilty to the charges, and he is currently out on bail

9  awaiting sentencing.

10     4.   Defendant Ray J. Garcia was the associate warden at FCI Dublin

11  between December 2018 and November 2020 – the entire period that Plaintiff was

12  being abused by Defendant Klinger. As the warden, Garcia was responsible for

13  safekeeping, care, protection, discipline, programming, and release of inmates

14  incarcerated at FCI Dublin. Garcia was also responsible for hiring, training, and

15  supervising/managing staff, and determining operating procedures and policies.

16     5.   Garcia was also arrested and charged with sexual abuse of a ward

17  based on his sexual abuse of multiple female inmates at FCI Dublin.

18     6.   Garcia led training on the Prison Rape and Elimination Act and

19  chaired the audit of FCI Dublin under the PREA. Thus, the man responsible for

20  teaching inmates how to report rape was in fact a serial rapist of inmates.

21     7.   As a result of Defendants' actions, Plaintiff suffered numerous

22  emotional injuries and incurred severe personal injuries, which continue to affect

23  her today.

24     8.   When Plaintiff was released to a halfway house on September 4, 2020,

25  Klinger continued his abuse and threatened Plaintiff with physical harm if she

26  refused to submit to him.

27     9.   Plaintiff brings this civil action and asserts claims: (1) against Klinger

28  and Garcia under the Eighth Amendment's Cruel and Unusual Punishment Clause

1  (Excessive Force), California's gender violence and sexual assault statutes (Civil

2  Code §§ 52.4 and 1708.5), and California common law (Battery and Negligence);

3  (2) against FCI Dublin under the Eighth Amendment's Cruel and Unusual

4  Punishment Clause (Deliberate Indifference); (3) against FCI Dublin under the

5  Fifth Amendment's Due Process Clause (Procedural Due Process); and (4) against

6  the United States of America under the Federal Tort Claims Act (28 U.S.C. §§

7  1346(b), 1671-2680) ("FTCA") for various tort claims against all Defendants

8  arising under California common law committed within the course and scope of

9  their federal office or employment.

10      10.    For these violations, Plaintiff seeks nominal, compensatory, and

11  punitive damages, attorneys' fees and costs, and any other relief that the Court

12  deems appropriate.

13          **JURISDICTION AND VENUE**

14      11.    Plaintiff's claims arise under the United States Constitution, California

15  statutory law, California common law, and the FTCA. The Court has diversity

16  jurisdiction over Plaintiff's entire action under 28 U.S.C. § 1332 because Plaintiff

17  and Defendants are diverse in citizenship and more than $75,000 is in controversy.

18  The Court also has federal question jurisdiction over Plaintiff's Constitutional

19  claims and FTCA claims (which have been administratively exhausted) under 28

20  U.S.C. § 1331. And the Court has supplemental jurisdiction over Plaintiff's

21  California statutory and common-law claims under 28 U.S.C. § 1367 because these

22  state-law claims arise from a common nucleus of operative fact with Plaintiff's

23  federal question claims.

24      12.    The Court also has personal jurisdiction over Defendants. The Court

25  has general jurisdiction over Defendants because, on information and belief, each

26  Defendant is a citizen of, and domiciled in, California. The Court has specific

27  jurisdiction over Defendants because they committed the actions and omissions

28  forming the basis for each claim against them in California.

THE PRIDE
LAW FIRM

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1402(b). As noted above, Defendants' actions and omissions that give rise to Plaintiff's claims all occurred in this District, at FCI Dublin, located at 5701 8th St., Dublin, California 94568.

## INTRADISTRICT ASSIGNMENT

14. Pursuant to Civil Local Rule 3-29(d), Plaintiff's action is properly assigned to the San Francisco Division of this District because the action arises from actions and omissions taken in Alameda County, California, where FCI Dublin is located.

## PARTIES

15. Plaintiff is an individual and citizen of Thermal, California. During the relevant period, Plaintiff was incarcerated at FCI Dublin in Dublin, California. Plaintiff has now completed her sentence and is released from custody.

16. Upon information and belief, Defendant Ross Klinger is an individual and citizen of California, where he is domiciled. During the relevant period, Klinger worked as a correctional officer at FCI Dublin in the Bureau of Prison's (BOP's) employment. While performing the acts and omissions that Plaintiff alleges in this complaint, Klinger was acting within the scope of his official employment, or with the BOP's permission and consent.

17. Upon information and belief, Defendant Ray J. Garcia is an individual and citizen of California, where he is domiciled. During the relevant period, Garcia worked as the associate warden at FCI Dublin in the BOP's employment. While performing the acts and omissions that Plaintiff alleges in this complaint, Garcia was acting within the scope of his official employment, or with the BOP's permission and consent.

18.     Defendant FCI Dublin is an all-female low security federal correctional institution with an adjacent minimum-security satellite camp located in Dublin, California. This facility is located within the Northern District of California (NDCA).

19.     Defendant United States is a governmental entity. During the relevant period, the United States, through the BOP, a federal agency, was in possession and control of FCI Dublin, a minimum-security federal prison located in Dublin, California. The United States has waived sovereign immunity as to Plaintiff's tort claims against Klinger, pursuant to FTCA, 28 U.S.C. § 2674.

## STATEMENT OF FACTS

**A.     PREA regulations provide mandatory procedures for preventing, reporting, investigating, and responding to reports of staff sexual abuse of an inmate.**

20.     PREA regulations require the BOP to have a strict "written policy mandating zero tolerance toward all forms of sexual abuse and sexual harassment and outlining the [BOP's] approach to preventing, detecting, and responding to such conduct," which the BOP has adopted.[1]

21.     PREA regulations also comprehensively mandate that the BOP and its correctional staff follow certain policies and procedures when an inmate has allegedly suffered sexual abuse.

22.     First and foremost, the BOP "shall require all staff to report immediately" "any knowledge, suspicion, or information regarding an incident of sexual abuse" and "staff neglect or violation of responsibilities that may have contributed to an incident or retaliation."[2] "Apart from reporting to designated supervisors or officials, staff shall not reveal any information related to a sexual abuse report to anyone other than to the extent necessary, as specified in agency

---

[1] *See* BOP Program Statement No. 5324.11, at 15 (Jan. 6, 2014); 28 C.F.R. § 115.11(b), (c).
[2] 28 C.F.R. § 115.61(a).

policy, to make treatment, investigation, and other security and management decisions."[3]

23.     Regardless of whether a report of sexual abuse is made, if an inmate is "subject to a substantial risk of imminent sexual abuse, [BOP employees] shall take immediate action to protect the inmate."[4]

24.     Upon receiving a report of inmate sexual abuse, the facility is required to report it to a designated internal investigator[5] and conduct an administrative or criminal investigation.[6] A criminal investigation is required for all allegations of inmate sexual abuse, "unless the allegation does not involve potentially criminal behavior."[7] All such referrals must be documented.[8]

25.     Given the high risk for retaliation against a reporter or victim, the BOP is required to "protect all inmates and staff who report sexual abuse or sexual harassment or cooperate with sexual abuse or sexual harassment investigations from retaliation by other inmates or staff and shall designate which staff members or departments are charged with monitoring retaliation."[9] A prison's PREA compliance manager must monitor an inmate sexual abuse victim for 90 days after a report of abuse is filed to ensure that he or she is not retaliated against by prison staff.[10]

26.     The BOP must also provide ongoing access to mental healthcare to all inmates who have been victimized by sexual abuse while detained in the facility.[11]

27.     The BOP is required to train every employee who may have contact with inmates to comply with the above PREA regulations and must "document,

[3] Id. § 115.61(b)
[4] Id. § 115.62
[5] Id. § 115.61(e)
[6] Id. § 115.22(a); see also Id. § 115.71
[7] Id. § 115.22(b)
[8] Id.
[9] Id. § 115.67(a).
[10] 28 C.F.R. § 115.67(c); BOP Program Statement No. 5324.11, at 44 (Jan. 6, 2014)
[11] Id. § 115.83(a), (b), (h).

through employee signature or electronic verification, that employees understand the training they have received."[12] In addition to this general training, specialized training is required for sexual abuse investigators.[13]

28.     Where an investigation finds that a staff member has engaged in sexual abuse, the presumptive disciplinary sanction is termination, and some form of discipline is required.[14]

29.     Finally, all documentation relating to an allegation of inmate sexual abuse must be maintained[15] and securely retained for at least ten years after the date of initial collection.[16]

30.     Defendants repeatedly violated these PREA regulations.

**B. Klinger routinely subjected Plaintiff to sexual abuse.**

31.     When Plaintiff began serving her sentence at FCI Dublin, she was assigned to the recycling crew which was led by Klinger. Klinger was known for showing up to work drunk and regularly reeking of alcohol. Klinger yelled at the inmates and cussed at them telling them that they were felons who needed to be treated like shit. His angry demeanor struck fear in the inmates, including Plaintiff.

32.     About a month after working on the recycling crew, Klinger turned his attention to Plaintiff. He started being nicer to her and told her that he wanted to get to know her better. Klinger brought her and the other five inmates that were part of the recycling crew Starbucks and fast food. He told her that he cared for her and wanted to be with her.

33.     As part of the recycling crew, one of Plaintiff's duties was to walk around the prison collecting recycling materials. Klinger accompanied Plaintiff on the walks. In approximately April 2020 during one of their walks, Klinger

---

[12] *Id.* § 115.31.
[13] *Id.* § 115.34.
[14] *Id.* § 115.76.
[15] *Id.* § 115.87(a), (d).
[16] *Id.* § 115.89(a), (d).

THE PRIDE
LAW FIRM

1    and Plaintiff stopped at the safety warehouse inside a Conex box where Klinger

2    performed oral sex on Plaintiff and had sexual intercourse with her.

3        34.    These sexual encounters continued until approximately October

4    2020 when Klinger was transferred to the Metropolitan Correctional Center

5    (MCC) San Diego. Plaintiff estimates that Klinger had sex with her

6    approximately five times inside the Conex box while another inmate was

7    instructed to serve as a look out. It should be noted that there were no video

8    surveillance cameras in or around the Conex box to capture the illegal activity

9    by Klinger or to protect Plaintiff. In fact, FCI Dublin failed to have adequate

10   working and monitored video surveillance cameras to monitor inmate and

11   employee behavior.

12       35.    After Klinger's transfer to MCC San Diego, he continued to

13   correspond via email with Plaintiff, using the alias "Juan Garcia." Plaintiff also

14   had frequent video visits with Klinger using the alias "Juan Garcia." Klinger

15   used an alias to conceal his relationship as he likely knew his name would be

16   familiar to BOP staff.

17       36.    Klinger was also in contact with Plaintiff's mother and gave her

18   money to put in Plaintiff's commissary account. Per BOP policy, correctional

19   officers cannot become financially involved with inmates. Klinger provided

20   money to Plaintiff's mother to conceal his involvement with her from the BOP.

21       37.    Plaintiff was released from FCI Dublin to a halfway house and

22   Klinger continued to communicate with her via calls, text messages, and

23   Snapchat. Phone records revealed approximately 427 calls or attempted calls

24   and approximately 497 text messages between Klinger and Plaintiff's phone

25   during the roughly one-month period she was in the halfway house.

26

27

28

38.     On or about September 28, 2020, the Facility Director of the halfway house confiscated Plaintiff's phone and saw the text messages from Klinger. One photograph (shown below) depicted Klinger shirtless.



Plaintiff responded with photographs of herself wearing her underwear and bra.

39.     Snapchat messages from username "Klinger1983ross" were romantic and told Plaintiff that she needed to be with him.

40.     Klinger visited Plaintiff at the halfway house and took her to a nearby Best Western motel to have sex on two occasions. Klinger told Plaintiff that he wanted to impregnate her and to become a father. He disclosed that his

1  wife left him because he is an alcoholic and they could not conceive. On the last

2  visit to the hotel, Klinger proposed to Plaintiff and gave her a diamond ring.

3      41.    The halfway house reported the messages and visits to law

4  enforcement and Plaintiff was interviewed by them. Plaintiff told them about

5  what Klinger did to her and about the various correctional officers who were

6  abusing female inmates at FCI Dublin. Law enforcement spoke to a Best

7  Western hotel employee who saw Klinger and they advised that they saw

8  Klinger with several different women and that it looked "a little strange."

9      42.    Klinger was able to sexually abuse Plaintiff through active and

10  passive coercion. Klinger's sexual abuse of Plaintiff continued in this manner

11  for almost one year and occurred on several occasions. From approximately

12  April through October 2020, Klinger manipulated Plaintiff into performing oral

13  sex and engaging in forced sexual intercourse, which was unwelcome, offensive,

14  and nonconsensual. Klinger eventually used threats of violence and money to

15  silence Plaintiff's family from reporting his conduct. He gave Plaintiff $6,000

16  and an iPhone 12.

17      43.    Unfortunately for Plaintiff, she was sent back to FCI Dublin and

18  suffered retaliation. While in Covid quarantine, Correctional Office Salcedo

19  bullied her for talking to law enforcement. He told her that she would never see

20  her kids again and was going to die in prison. Plaintiff's fear and anxiety were

21  more than she could handle. She asked for mental health services and was

22  denied. She started cutting herself and spiraled into severe depression. She was

23  placed in solitary confinement for two weeks for her "protection" from other

24  officers. During that time, she was not allowed to communicate with her family,

25  nor did she have access to letters or emails.

26      44.    Throughout the time Klinger sexually abused Plaintiff, she told him

27  that she did not want to be with him. However, he told her that if she were not

28  with him, she could not be with anyone else. Klinger threatened her and told her

THE PRIDE
LAW FIRM

1  that if she snitched, he was going to kill her. He told her that he had nothing to

2  lose because his mother had passed, and his dad had cancer. Klinger told

3  Plaintiff that she had to stay with him forever or he would kill her with a

4  pitchfork and/or hang her. Not only did Klinger threaten to kill her, but he also

5  said he would kill her mother and her children. Klinger advised that he looked in

6  the prison computer, had her family's addresses and knew all about her. To this

7  day, Plaintiff lives in fear because Klinger is out on bail. Furthermore, Klinger

8  had his fellow correctional officer, John Bellhouse (also indicted for his criminal

9  conduct at FCI Dublin) contact Plaintiff to threaten her.

10       45.    Klinger's conduct is just an example of some of the cruel and

11  unusual punishment that Plaintiff endured at FCI Dublin. From the lower level

12  correctional officers like Perez who commented about her hair being braided by

13  saying "imagine me behind you, pulling on your braids" to medical staff like

14  Doctor Abellera (uncertain of spelling of name) who performed a digital vaginal

15  examination on her that made her uncomfortable while telling her to repeatedly

16  squeeze his fingers with her vaginal walls, to Associate Warden Garcia who she

17  saw videotaping inmates with his cell phone, the abuse permeated all levels of

18  the prison. Plaintiff tried to speak out and get help. She filed numerous

19  complaints and asked to speak to the captain about the misconduct. Her

20  complaints went unanswered.

21       **C. FCI Dublin is known for its culture of tolerating sexual**

22            **misconduct.**

23       46.    These facts are either known to us or are based on information and

24  belief. Throughout the last three decades at least, FCI Dublin has repeatedly

25  ignored incidents of sexual misconduct. Currently, five employees have been

26  indicted by the Department of Justice for sexual misconduct, three have pled

27  guilty, and nine other employees are on administrative leave pending

28  investigation – the most in U.S. history of the Bureau of Prisons. The following

1  examples are just a fraction of the magnitude of sexual misconduct and violence

2  that transpired at FCI Dublin:

3  - There were at least two sexual abuse allegations made against FCI

4    Dublin guards in the 1990's and early 2000's.

5  - Inmate M.S. suffered sexual assault by multiple different BOP

6    employees: Officer Maven, Mr. Wilson, Dr. Abellera (uncertain re

7    name), and Safety Administrator John Bellhouse.

8    In approximately 2009, Officer Maven forced M.S. to have sexual

9    intercourse with him, threatening to keep her in prison for the rest

10   of her life if she ever told anyone.

11   At another point during M.S.'s incarceration, a member of the

12   medical staff at FCI Dublin, Mr. Wilson, picked her up and

13   attempted to kiss her. M.S. reported Mr. Wilson to SIA Lieutenant

14   Putnam but nothing occurred.

15   In 2016, M.S. was sexually assaulted by Dr. Abellera (exact name

16   unknown), the man who was responsible for performing all the pap

17   smears at FCI Dublin. He stuck his fingers inside her and asked,

18   "How does that feel?" in a sexual manner. M.S. reported to Dr.

19   Stoll that she never wanted to get an exam from him again, and she

20   sent an email following up. Dr. Abellera eventually left the prison

21   after some other women complained.

22  - In 2019, an FCI inmate, Victoria Peterson, filed a suit against

23   Officer William Martinez for abusing his power and using

24   excessive force to have sex with her. She also sued the warden at

25   the time, Wiley Jenkins, for failing to take disciplinary action

26   against Martinez and allowing him to continue working at FCI

27   Dublin.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- In 2019, inmate L.I. filed a claim against former FCI Dublin chaplain James Highhouse for sexual assault. Highhouse started having unwanted physical contact with L.I. in May of 2018, and although he was ultimately charged with abuse of L.I., prosecutors said he engaged in predatory conduct with at least six women from 2014 to 2019. Highhouse pleaded guilty and was sentenced to seven years in prison.

- In 2020, Corrections Officer ("CO") John Bellhouse was employed at FCI Dublin in the position of safety administrator. He worked in the Recycling and Safety Program, supervising inmates alongside Klinger. M.S. worked in the recycling program where she was sexually assaulted by Bellhouse. CO Bellhouse was the third officer arrested from FCI Dublin out of the same sexual misconduct scheme. Bellhouse is charged with one count of sexual abuse of a ward in violation of 18 U.S.C. § 2243(b).

- Between approximately June of 2020 and September of 2020, inmate A.Z. witnessed Klinger's sexual relationship with Plaintiff. She witnessed Klinger take Plaintiff into a hidden area to have sex with him, and she saw Klinger's semen on Plaintiff's shirt afterward. Klinger and CO Jaime Perez spoke with sexually explicit language toward A.Z. CO Perez would bump up against her and grab her breasts. Officer Perez also took photos of A.Z.

- Between approximately August 2020 and November 2020, inmate D.V. was pressured into an ongoing sexual relationship with FCI Dublin Correctional Officer Enrique Chavez. CO Chavez kissed her, touched her bare breasts and vagina, and had D.V. touch his penis. CO Chavez was known to bring inmates into the kitchen closet for "meetings." CO Chavez has now been charged with

THE PRIDE
LAW FIRM

abusive sexual contact of a prisoner in violation of 18 U.S.C. § 2244(a)(4). He recently pled guilty to the conduct.

- It was common for male employees at FCI Dublin to stare at the inmates while they were naked in the shower. For example, inmate Y.S. witnessed CO Sergio Saucedo watching her in the shower between May of 2021 and October of 2021.

- Another inmate, A.J., suffered sexual abuse at FCI Dublin between approximately September 2021 and May of 2022. When A.J. arrived, Paramedic Fraser Cohen grabbed her breasts with no chaperone. Later throughout her incarceration, CO Nicholas Ramos consistently watched her in the shower, and both CO Ramos and CO Phillips made her strip, cough, and squat for cavity searches.

- Former Associate Warden Garcia has been charged with seven counts of sexually abusive conduct against three female victims who were serving prison sentences.

47.     Upon information and belief, Klinger, Garcia, Maven, Wilson, Abellera, Bellhouse, Highhouse, Perez, Chavez, Saucedo, Cohen, Ramos, and Phillips were not the only employees at FCI Dublin engaging in inappropriate conduct with inmates.

48.     At least 22 FCI Dublin employees, including those who courageously reported and/or acted to prevent instances of sexual violence, have been reassigned to other prisons. This reassignment got the attention of Congresswoman Jackie Speier, who wrote a letter to the new Director of the Federal Bureau of Prisons, Colette Peters, requesting information about FCI Dublin's "culture of rampant sexual misconduct and subsequent cover-ups."[17]

---

[17] Fox2KTVU Reporter Lisa Fernandez: https://www.ktvu.com/news/dublin-prison-guard-says-she-was-forced-out-for-reporting-abuse

THE PRIDE LAW FIRM

PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

## CLAIMS FOR RELIEF

### CLAIM ONE

### EIGHTH AMENDMENT, CRUEL AND UNUSUAL PUNISHMENT – SEXUAL ABUSE

**(Against Klinger and Garcia in their individual capacities)**

49.   Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth herein.

50.   Plaintiff brings this claim under the Cruel and Unusual Punishment Clause of the Eighth Amendment to the U.S. Constitution against Klinger and Garcia in their individual capacities.

51.   At all material times, Klinger and Garcia were federal employees of the BOP at FCI Dublin, acting under the color of federal authority with respect to the allegations in this complaint.

52.   Klinger violated Plaintiff's right to be free from cruel and unusual punishment by repeatedly sexually abusing her while she was incarcerated as a minimum-security inmate at FCI Dublin. This sexual abuse included repeated sexual intercourse, among other sexual acts.

53.   Klinger's sexual abuse of Plaintiff occurred under coercive circumstances.

54.   By intentionally subjecting Plaintiff to sexual acts, Klinger acted maliciously, in a manner that is deeply offensive to human dignity and void of any penological justification.

55.   The inhumane conditions of confinement caused by Klinger's repeated sexual abuse for almost one year caused Plaintiff severe physical, mental, and emotional harm.

56.   Garcia was the associate warden during the entire period that Plaintiff was being abused by Klinger. As the warden, Garcia was responsible for safekeeping, care, protection, discipline, programming, and release of inmates

1  incarcerated at FCI Dublin. Garcia was also responsible for hiring, training, and
2  supervising/managing staff, and determining operating procedures and policies.

3      57.    Garcia was also sexual abusing wards at FCI Dublin, and in his
4  capacity as warden, thus ratified Klinger's behavior. Garcia led PREA training and
5  chaired the audit of FCI Dublin under the PREA. Thus, the man responsible for
6  teaching inmates how to report rape was in fact a serial rapist of inmates.

7      58.    Klinger and Garcia acted with malice and oppression, and their
8  conduct constitutes a reckless or callous disregard of Plaintiff's rights, entitling
9  Plaintiff to punitive damages.

10     59.    Plaintiff seeks the following relief for her injuries: (a) nominal
11 damages resulting from the repeated violations of her personal dignity and from
12 physical injury; (b) non-economic damages consisting of past physical injury,
13 past and future mental pain and suffering, mental anguish, emotional distress,
14 and for offenses to her personal dignity; and (c) punitive damages.

15                    **CLAIM TWO**
16          **GENDER VIOLENCE (Cal. Civ. Code § 52.4)**
17          **(Against Klinger in his individual capacity)**

18     60.    Plaintiff repeats and incorporates by reference every allegation
19 contained in the preceding paragraphs as if fully set forth herein.

20     61.    Plaintiff brings this claim for gender violence under California
21 Civil Code § 52.4 against Klinger in his individual capacity.

22     62.    Under California statute, any person subjected to gender violence
23 may bring a civil action for damages against the responsible party. Gender
24 violence is a form of sex discrimination that includes a physical intrusion or
25 invasion of a sexual nature under coercive conditions.

26     63.    Klinger discriminated against Plaintiff based on her female gender
27 when he repeatedly sexually abused her, by physically subjecting her to sexual
28 acts, under the coercive conditions that were present between them.

THE PRIDE
LAW FIRM

1   64.    Klinger's actions occurred outside the course and scope of his

2   employment. His actions and judgments in sexually abusing Plaintiff were so far

3   below the acceptable standard of custodial conduct, as exemplified by PREA

4   regulations and BOP policy prohibiting sexual abuse, that he could not have

5   been making a policy judgment in his decision to sexually abuse Plaintiff.

6   65.    By repeatedly subjecting Plaintiff to sexual acts, Klinger caused her

7   to suffer physical, mental, and emotional injuries, as well as injuries to her

8   personal dignity.

9   66.    Klinger acted with malice and oppression and his conduct

10  constitutes a reckless or callous disregard of Plaintiff's rights, entitling her to

11  punitive damages.

12  67.    Plaintiff seeks the following relief for her injuries: (a) nominal

13  damages resulting from the repeated violations of her personal dignity and from

14  physical injury; (b) non-economic damages consisting of past physical injury,

15  past and future mental pain and suffering, mental anguish, emotional distress,

16  and for offenses to her personal dignity; and (c) punitive damages.

17  68.    Plaintiff also seeks attorney's fees and costs, as expressly

18  authorized by statute.

19  ### CLAIM THREE

20  **SEXUAL ASSAULT (Cal. Civ. Code § 1708.5)**

21  **(Against Klinger in his individual capacity)**

22  69.    Plaintiff repeats and incorporates by reference every allegation

23  contained in the preceding paragraphs as if fully set forth herein.

24  70.    Plaintiff brings this claim for sexual assault under California Civil

25  Code § 1708.5 against Klinger in his individual capacity.

26

27

28

71.    Klinger violated Plaintiff's statutory right to be free from sexual assault by repeatedly sexually abusing her while she was incarcerated as a minimum-security inmate at FCI Dublin. This sexual abuse included repeated sexual intercourse, among other sexual acts.

72.    Klinger's sexual abuse of Plaintiff occurred under coercive circumstances.

73.    For these reasons, Klinger's sexual abuse of Plaintiff, an inmate in the custody of his employer, was deeply offensive to her personal dignity, would offend a person of ordinary sensitivity, and was unwarranted by the social usages in prison when the contact was made.

74.    Given the deeply offensive nature of these sexual acts and lack of any possible penological justification for these sexual acts, Klinger must have subjected Plaintiff to these sexual acts with the intent to cause a harmful or offensive contact with Plaintiff's person.

75.    By intentionally subjecting Plaintiff to sexual acts, Klinger acted maliciously, in a manner that is deeply offensive to human dignity and void of any penological justification.

76.    Klinger's actions occurred outside the course and scope of his employment. His actions and judgments in sexually abusing Plaintiff were so far below the acceptable standard of custodial conduct, as exemplified by PREA regulations and BOP policy prohibiting sexual abuse, that he could not have been making a policy judgment in his decision to sexually abuse Plaintiff.

77.    By repeatedly subjecting Plaintiff to sexual acts, Klinger caused her to suffer physical, mental, and emotional injuries, as well as injuries to her personal dignity.

78.    Klinger acted with malice and oppression, and his conduct constitutes a reckless or callous disregard of Plaintiff's rights, entitling her to punitive damages.

THE PRIDE
LAW FIRM

79.     Plaintiff seeks the following relief for her injuries: (a) nominal damages resulting from the repeated violations of her personal dignity and from physical injury; (b) non-economic damages consisting of past physical injury, past and future mental pain and suffering, mental anguish, emotional distress, and for offenses to her personal dignity; and (c) punitive damages.

## CLAIM FOUR

### BATTERY (California common law)

### (Against Klinger in his individual capacity)

80.     Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth herein.

81.     Plaintiff brings this claim for battery under California common law against Klinger in his individual capacity.

82.     Klinger committed battery against Plaintiff by repeatedly sexually abusing her while she was incarcerated as a minimum-security inmate at FCI Dublin. This sexual abuse included repeated sexual intercourse, among other sexual acts.

83.     Klinger's sexual abuse of Plaintiff occurred under coercive circumstances.

84.     For these reasons. Klinger's sexual abuse of Plaintiff, an inmate in the custody of his employer, was deeply offensive to her personal dignity, would offend a person of ordinary sensitivity, and was unwarranted by the social usages in prison when the contact was made.

85.     Given the deeply offensive nature of these sexual acts and lack of any possible penological justification for these sexual acts, Klinger must have subjected Plaintiff to these sexual acts with the intent to cause a harmful or offensive contact with Plaintiff's person.

THE PRIDE
LAW FIRM

86. By intentionally subjecting Plaintiff to sexual acts, Klinger acted maliciously in a manner that is deeply offensive to human dignity and void of any penological justification.

87. Klinger's actions occurred outside the course and scope of his employment. His actions and judgments in sexually abusing Plaintiff were so far below the acceptable standard of custodial conduct, as exemplified by PREA regulations and BOP policy prohibiting sexual abuse, that he could not have been making a policy judgment in his decision to sexually abuse Plaintiff.

88. By repeatedly subjecting Plaintiff to sexual acts, Klinger caused her to suffer physical, mental, and emotional injuries, as well as injuries to her personal dignity.

89. Klinger acted with malice and oppression, and his conduct constitutes a reckless or callous disregard of Plaintiff's rights, entitling her to punitive damages.

90. Plaintiff seeks the following relief for her injuries: (a) nominal damages resulting from the repeated violations of her personal dignity and from physical injury; (b) non-economic damages consisting of past physical injury, past and future mental pain and suffering, mental anguish, emotional distress, and for offenses to her personal dignity; and (c) punitive damages.

## CLAIM FIVE

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

#### (California common law)

#### (Against Klinger in his individual capacity)

91. Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth herein.

92. Plaintiff brings this claim for intentional infliction of emotional distress under California common law against Klinger in his individual capacity.

93.   Klinger engaged in outrageous conduct by repeatedly subjecting Plaintiff to sexual acts while she was incarcerated as an inmate in his employer's custody. Klinger abused his authority over Plaintiff and his power to affect her interests in a manner that was beyond all bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized society.

94.   Klinger's sexual abuse caused Plaintiff to suffer, and continue to suffer, severe emotional distress, including fear, depression, and anxiety. This distress was so substantial and enduring that no reasonable person in a civilized society should be expected to endure it.

95.   Klinger intended to cause Plaintiff this emotional distress because he knew that emotional distress was certain to result from his sexual abuse of an inmate.

96.   Klinger's actions occurred outside the course and scope of his employment. His actions and judgments in sexually abusing Plaintiff were so far below the acceptable standard of custodial conduct, as exemplified by PREA regulations and BOP policy prohibiting sexual abuse, that he could not have been making a policy judgment in his decision to sexually abuse Plaintiff.

97.   Klinger acted with malice and oppression, entitling Plaintiff to punitive damages.

98.   Plaintiff seeks the following relief for her injuries: (a) nominal damages resulting from the repeated violations of her personal dignity and from physical injury; (b) non-economic damages consisting of past physical injury, past and future mental pain and suffering, mental anguish, emotional distress, and for offenses to her personal dignity; and (c) punitive damages.

## CLAIM SIX

### NEGLIGENCE (California common law)

### (Against Klinger and Garcia in their individual capacities)

99.   Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth herein.

100.   Plaintiff brings this claim for negligence under California common law against Klinger and Garcia in their individual capacities.

101.   Garcia and Klinger had a special and heightened duty of care to Plaintiff as her jailers that required them to protect her against reasonably foreseeable harm, including sexual abuse. PREA regulations and BOP policy prohibiting sexual abuse confirm this special and heightened duty.

102.   Alternatively, Garcia and Klinger had a general duty of care with respect to Plaintiff.

103.   Klinger repeatedly breached his duty of care to Plaintiff by subjecting her to sexual acts. A reasonably prudent prison guard would not have engaged in that conduct. Garcia ratified Klinger's conduct and engaged in similar unlawful conduct with other inmates.

104.   Klinger and Garcia acted in a manner that is void of any penological justification.

105.   Klinger's and Garcia's actions occurred outside the course and scope of their employment. Their actions and judgments in sexually abusing Plaintiff were so far below the acceptable standard of custodial conduct, as exemplified by PREA regulations and BOP policy prohibiting sexual abuse, that they could not have been making a policy judgment in sexually abusing and/or ratifying the sexual abuse of Plaintiff.

106.   By repeatedly subjecting Plaintiff to sexual acts, Klinger and Garcia proximately caused her to suffer physical, mental, and emotional injuries, as well as injuries to her personal dignity.

107.   Klinger and Garcia acted with malice and oppression, and their conduct constitutes a reckless or callous disregard of Plaintiff's rights, entitling her to punitive damages.

108.   Plaintiff seeks the following relief for her injuries: (a) nominal damages resulting from the repeated violations of her personal dignity and from physical injury; (b) non-economic damages consisting of past physical injury, past and future mental pain and suffering, mental anguish, emotional distress, and for offenses to her personal dignity; and (c) punitive damages.

## CLAIM SEVEN

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (California common law)

### (Against Klinger in his individual capacity)

109.   Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth herein.

110.   Plaintiff brings this claim for negligent infliction of emotional distress under California common law against Klinger in his individual capacity.

111.   Klinger had a special and heightened duty of care to Plaintiff as her jailer that required him to protect her against reasonably foreseeable emotional harm, including from sexual abuse. PREA regulations and BOP policy prohibiting sexual abuse confirm this special and heightened duty.

112.   Alternatively, Klinger had a general duty of care with respect to Plaintiff.

113.   Klinger engaged in negligent conduct and in a willful violation of statutory standards. On multiple occasions, Klinger breached his duty of care and the PREA regulations by purposefully and willingly subjecting Plaintiff to sexual acts. Klinger's breaches of his duty of care and willful violations of statutory standards were directed at Plaintiff.

114.   By repeatedly subjecting Plaintiff to sexual acts, Klinger proximately caused her to suffer, and to continue to suffer, serious and severe emotional distress.

115.   Plaintiff's emotional reactions are not an abnormal response to her sexual abuse. A reasonable person would be unable to cope with the mental distress caused by being sexually abused by a correctional officer who had a duty to protect her from such abuse. No reasonable person in a civilized society should be expected to endure that kind of mental distress.

116.   Klinger's actions occurred outside the course and scope of his employment. His actions and judgments in sexually abusing Plaintiff were so far below the acceptable standard of custodial conduct, as exemplified by PREA regulations and BOP policy prohibiting sexual abuse, that he could not have been making a policy judgment in his decision to have sex with Plaintiff.

117.   Klinger acted with malice and oppression, and his conduct constitutes a reckless or callous disregard of Plaintiff rights, entitling her to punitive damages.

118.   Plaintiff seeks the following relief for her injuries: (a) nominal damages resulting from the repeated violations of her personal dignity and from physical injury; (b) non-economic damages consisting of past physical injury, past and future mental pain and suffering, mental anguish, emotional distress, and for offenses to her personal dignity; and (c) punitive damages.

## CLAIM EIGHT

## EIGHTH AMENDMENT, DELIBERATE INDIFFERENCE – FAILURE TO PROTECT

### (Against Garcia in his individual capacity)

119.   Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth herein.

120. Plaintiff brings this claim against Garcia in his individual capacity under the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution.

121. At all material times, Garcia was a federal employee, acting under the color of federal authority with respect to the allegations set forth above.

122. Garcia deprived Plaintiff of her right to be free from cruel and unusual punishment by failing to protect her from a substantial risk of serious harm from sexual abuse by Klinger by acting in conscious disregard of that known risk.

123. Garcia, as the warden, ratified Klinger's conduct by engaging in the same or similar acts as Klinger with other inmates at FCI Dublin. Therefore, Garcia purposefully denied Plaintiff protection from the known and substantial risk of serious harm of Klinger's sexual abuse.

124. Garcia failed to take immediate action to protect Plaintiff, including by separating her from Klinger, in violation of 28 C.F.R. § 115.62.

125. Garcia did not take reasonable, available measures to abate the risk of sexual abuse to Plaintiff, and to guarantee her safety, even though a reasonable officer in the circumstances would have appreciated the obviously high degree of risk involved.

126. Garcia therefore acted with deliberate indifference to substantial risk of sexual abuse in violation of the Eighth Amendment, subjected Plaintiff to dangerous and debasing conditions of confinement, including sexual abuse, and violated her fundamental rights to safe and humane confinement. This cruel and unusual punishment caused Plaintiff physical, mental, emotional, and constitutional injuries.

127. Garcia's deliberate indifference was malicious, oppressive, reckless, and callous, entitling Plaintiff to punitive damages.

1    128.   Plaintiff seeks the following relief for her injuries: (a) nominal
2  damages resulting from the repeated violations of her personal dignity and from
3  physical injury; (b) non-economic damages consisting of past physical injury,
4  past and future mental pain and suffering, mental anguish, emotional distress,
5  and for offenses to her personal dignity; and (c) punitive damages.

6    **FEDERAL TORT CLAIMS ACT ADMINISTRATIVE EXHAUSTION**

7    129.   Claims Nine and Ten, below, are asserted against the United States.
8    130.   Plaintiff has exhausted these claims against the United States under
9  the FTCA.

10   131.   Plaintiff submitted a "Claim for Damage Injury, or Death" to the
11  BOP on October 18, 2021, for "permanent injuries, mental anguish,
12  embarrassment, humiliation, pain, distress, and damages" as a PREA victim
13  involving staff at FCI Dublin in the sum of $5,000,000.00.

14   132.   A true and correct copy of Plaintiff's FTCA claim is attached
15  hereto as **Exhibit A**.

16   133.   The BOP received her administrative claim on November 23, 2021.

17   134.   A true and correct copy of the BOP's acknowledgment is attached
18  hereto as **Exhibit B**.

19   135.   By May 23, 2022, six months after the BOP received Plaintiff's
20  administrative claim, the BOP has neither accepted nor rejected the claims.
21  Pursuant to 28 U.S.C. § 2675(a), Plaintiff elects to consider this failure to act as
22  a final denial of her claim.

23   **CLAIM NINE**
24   **NEGLIGENCE (FTCA, California common law)**
25   **(Against the United States)**

26   136.   Plaintiff repeats and incorporates by reference every allegation
27  contained in the preceding paragraphs as if fully set forth herein.

28

THE PRIDE
LAW FIRM

137.  Plaintiff brings this claim against the United States under the FTCA based on the actions and/or omissions of Klinger and Garcia taken while working at FCI Dublin in their capacity as employees of the BOP and acting within the scope of their employment, with the permission and consent of the United States.

138.  At all material times, Plaintiff was an inmate in the custody of the BOP, a federal agency of the United States in possession and control of FCI Dublin.

139.  **Duty**. Garcia and Klinger had a custodial duty, as well as a mandatory statutory obligation under PREA regulations and BOP policy, to protect inmates incarcerated by the United States from foreseeable harm, including, but not limited to, harm from sexual abuse.

140.  Alternatively, Garcia and Klinger had a general duty of care to Plaintiff.

141.  Klinger's sexual abuse of Plaintiff was reasonably foreseeable to Garcia because Klinger's conduct made it obvious he was sexually abusing Plaintiff.

142.  **Breach of duty—inadequate supervision**. Garcia failed to supervise and operate FCI Dublin in a manner that would have prevented Klinger's ongoing sexual abuse of Plaintiff.

143.  Garcia did not take reasonable, available measures to abate the risk of sexual abuse to Plaintiff, and to guarantee her safety, even though a reasonable administrator would have complied with PREA regulations regarding proper prison operations, including adequately monitoring work programming and correctional officer assignments.

144.  Klinger's sexual abuse of Plaintiff occurred as the direct and proximate result of the supervisory negligence of Garcia.

145.   **Injuries and relief sought**. Plaintiff suffered a physical violation, a violation of her liberty interest in being free from sexual abuse, injury from being denied freedom of movement and programming, and severe mental and emotional anxiety and distress, and will continue to suffer severe mental and emotional anxiety and distress in the future.

146.   Plaintiff seeks the following relief for her injuries: non-economic damages consisting of past physical injury, past and future mental pain and suffering, mental anguish, emotional distress, and for offenses to her personal dignity.

## CLAIM TEN

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (FTCA, California law)

### (Against the United States)

147.   Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth herein.

148.   Plaintiff brings this claim against the United States under the FTCA based on the actions and/or omissions of Klinger and Garcia which were taken while working at FCI Dublin in their capacity as employees of the BOP and acting within the scope of their employment, with United States' permission and consent.

149.   At all material times, Plaintiff was an inmate in the custody of the BOP, a federal agency of the United States in possession and control of FCI Dublin.

150.   **Duty**. Garcia and Klinger had a custodial duty, as well as a mandatory statutory obligation under PREA regulations and BOP policy, to protect inmates incarcerated by the United States from foreseeable harm, including, but not limited to, harm from sexual abuse.

THE PRIDE
LAW FIRM

151.   **Breach of duty—inadequate supervision**. Garcia failed to supervise and operate FCI Dublin in a manner that would have prevented Klinger's ongoing sexual abuse of Plaintiff.

152.   Garcia did not take reasonable, available measures to abate the risk of sexual abuse to Plaintiff, and to guarantee her safety, even though a reasonable administrator would have complied with PREA regulations regarding proper prison operations, including adequately monitoring work programming and correctional officer assignments.

153.   Klinger's sexual abuse of Plaintiff occurred as the direct and proximate result of the supervisory negligence of Garcia.

154.   **Injuries and relief sought**. Klinger's and Garcia's actions and omissions caused Plaintiff to suffer, and continue to suffer, serious and severe emotional distress, including fear, depression, and anxiety, because of being repeatedly sexually abused.

155.   Plaintiff's emotional reaction was not an abnormal response to her sexual abuse. A reasonable person would be unable to cope with the emotional distress caused by being sexually abused by a correctional officer, who had a duty to protect her from such abuse. Plaintiff's distress was of such a substantial and enduring quality that no reasonable person in a civilized society should be expected to endure it.

156.   By reason of the United States' negligent infliction of emotional distress, through Garcia's and Klinger's conduct, Plaintiff has suffered severe emotional distress, and will continue to suffer severe mental and emotional anxiety and distress.

157.   Plaintiff seeks nominal and compensatory damages for these violations.

THE PRIDE
LAW FIRM

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all claims so triable.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that this Court grant the following relief:

1. Nominal damages in an amount to be determined at trial;

2. Compensatory damages for injuries caused by a violation of her constitutional rights and personal dignity, physical injury, pain, discomfort, fears, anxiety, and other mental and emotional distress suffered by Plaintiff and for similar suffering reasonably certain to be experienced in the future, in an amount to be determined at trial;

3. Punitive damages for malice, oppression, and reckless and callous disregard of Plaintiff's rights;

4. An award to Plaintiff of reasonable costs and fees; and

5. Such other and further relief as the Court may deem fit and proper.

Respectfully Submitted,

Dated: September 9, 2022

**THE PRIDE LAW FIRM**

/s/ Jessica K. Pride
Jessica K. Pride
Email: jpride@pridelawfirm.com
Attorneys for Plaintiff

# EXHIBIT A

# EXHIBIT A

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| The BOP Federal Correctional Institute Dublin 5701 8th St, Dublin, CA 94568 | ▓▓▓▓▓▓▓▓▓▓▓ Representation: Jessica Pride, Esq. The Pride Law Firm 2831 Camino Del Rio S. Ste 104 San Diego, CA 92108 |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|
| ☐ MILITARY  ☒ CIVILIAN | ▓▓▓▓▓ | Single | April 2020 - October 2020 | Ongoing |

8. BASIS OF CLAIM (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary.)

See Attached Document.

| 9. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

None.

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

| 10. | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

▓▓▓▓▓▓▓▓▓ has suffered physical and emotional damages, in an amount to be determined by an expert, due to BOP Officer Klinger's continued sexual assault of ▓▓▓▓▓▓

| 11. | | WITNESSES | |
|---|---|---|---|
| | NAME | | ADDRESS (Number, Street, City, State, and Zip Code) |
| | TBD | | |

12. (See instructions on reverse). AMOUNT OF CLAIM (in dollars)

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights) |
|---|---|---|---|
| | 5,000,000 | | 5,000,000 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side). | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE |
|---|---|---|
| *(signature)* | 619-516-8166 | 10/18/2021 |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government (See 31 U.S.C. 3729). | Fine, imprisonment, or both (See 18 U.S.C. 287, 1001.) |

| Authorized for Local Reproduction Previous Edition is not Usable 95-109 | NSN 7540-00-634-4046 | STANDARD FORM 95 (REV. 2/2007) PRESCRIBED BY DEPT. OF JUSTICE 28 CFR 14.2 |
|---|---|---|

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property.

15. Do you carry accident insurance?   ☐ Yes   If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number.   ☒ No

16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible?   ☐ Yes   ☒ No   17. If deductible, state amount.

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts).

19. Do you carry public liability and property damage insurance?   ☐ Yes   If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code).   ☒ No

## INSTRUCTIONS

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.**

### Complete all items - Insert the word NONE where applicable.

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY

**Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.**

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted.  Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations.  If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant.  A claim presented by an agent or legal representative must be presented in the name of the claimant.  If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

DAMAGES IN A **SUM CERTAIN** FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN **TWO YEARS** AFTER THE CLAIM ACCRUES.

The amount claimed should be substantiated by competent evidence as follows:

*(a)* In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

*(b)* In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

*(c)* In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident.  Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct

*(d)* Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
   A.  *Authority.*  The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B.  *Principal Purpose:*  The information requested is to be used in evaluating claims
C.  *Routine Use:*  See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D.  *Effect of Failure to Respond:*  Disclosure is voluntary.  However, failure to supply the requested information or to execute the form may render your claim "invalid."

## PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501.  Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC  20530 or to the Office of Management and Budget.  Do not mail completed form(s) to these addresses.

STANDARD FORM 95 REV (2/2007) BACK

**Attachment to Claim Form 95**

███████████████████████, a former inmate at Federal Correctional Institute ("FCI") Dublin (Register No.████████), presents this claim to the Bureau of Prisons ("BOP") based on her sexual assault by a federal correctional officer ("CO").

In 2020, CO Ross Klinger was employed at FCI Dublin. His title was Recycling Technician, and he was responsible for the supervision and discipline of inmates in the Recycling and Safety Program. ████████ was one of these inmates. Through his authoritative position over ████████ unlawfully and in violation of her civil and constitutional rights, CO Klinger initiated and continued a verbal and physical sexual relationship with ████████ This relationship lasted from April through October of 2020. CO Klinger manipulated ████████ into performing oral sex and engaging in forced sexual intercourse, which was unwelcomed, offensive, and nonconsensual touching. He eventually used money to silence ████ ████████ family from reporting his conduct.

CO Klinger was investigated by the Office of the Inspector General and then arrested. He currently faces federal criminal charges for Sexual Abuse of a Ward (18 U.S.C. § 2243(b)) stemming out of his conduct against ████████ and another inmate. Those charges are pending in the U.S. District Court for the Northern District of California, Case No. 21-MJ-71085-MAG. (See attached Ex. A). He potentially faces up to fifteen years in prison and a $250,000 fine.

CO Klinger's illegal and abusive behavior towards ████████ are only a symptom of a greater problem at FCI Dublin. Only a few months after CO Klinger was arrested, FCI Dublin's associate warden, Ray J. Garcia, was arrested and charged with the same crime – Sexual Abuse of a Ward – based on his sexual abuse of multiple female inmates at FCI Dublin. (See attached Ex. B). Per the affidavit of FBI Special Agent Katherine Barclay, Garcia was the associate warden between December 2018 and November 2020 – so the entire period that ████████ was being abused by CO Klinger. Her affidavit states that, "As the warden, Garcia is responsible for the safekeeping, care, protection, discipline, programming, and release of inmates incarcerated at FCI Dublin. Garcia is also responsible for hiring, training, and supervising and managing staff, and determining operating procedures and policies." In fact, Garcia himself led training on the Prison Rape Elimination Act and chaired the audit of FCI Dublin under the PREA. Thus, the man responsible for teaching inmates how to report rape was in fact a serial rapist of inmates.

The United States of American, the Bureau of Prisons, Associate Warden Garcia, and CO Klinger are liable for ████████ significant damages pursuant to both *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), and the Federal Tort Claims Act. Pursuant to *Bivens*, the federal government is liable when its agents or officers violate the civil rights of an individual. In this case, ████████ had the right to be free from cruel and unusual punishment, as guaranteed by the Eighth Amendment to the U.S. Constitution, as well as a right to privacy pursuant to the Fourth Amendment. CO Klinger's sexual abuse of ████████ constituted a deprivation of those rights. Further, ████████ has multiple causes of action under the Federal Tort Claims Act, including but not limited to: Negligence, Intentional Infliction of Emotional Distress, Assault and Battery, and Sexual Harassment. FCI Dublin had an institutional climate and/or pattern of sexual abuse of female inmates.

At all times relevant, Defendants owed a duty of care to ████████ and those similarly situated, of "safekeeping, care . . . [and] protection" pursuant to 18 U.S.C. § 4042(a)(2) and (3). Pursuant to 18 U.S.C. § 2243(b), correctional officers and guards are statutorily precluded from engaging in sexual acts with an inmate, such as ████████ Yet the BOP unlawfully and in violation of ████████ civil rights, failed to do anything to stop the sexual harassment, assault, or battery of ████████ by CO Klinger. The BOP developed and maintained policies and customs exhibiting deliberate indifference to the constitutional rights of women incarcerated at FCI Dublin. These policies both caused and allowed the previously alleged sexual assault and abuse of ████████ Further, Associate Warden Garcia and others inadequately supervised and trained the prison's correctional officers and other employees, including CO Klinger. The United States and BOP failed to detect and prevent sexually abusive behavior, even though they knew or should have known about the risks of inmates being isolated while working alone with COs in outside areas such as for the recycling program, and how that could facilitate sexual assault of inmates. They failed to take proper steps or exercise the requisite standard of care and skill ordinarily exercised by similar correctional facilities, wardens, associate wardens, and correctional officers to deter and prevent sexually abusive behavior and control and supervise those in their employ. Associate Warden Garcia facilitated a culture in which inmates and staff members were rewarded for keeping secrets, assisting in preventing detection of sexual abuse of inmates, and failing to disclose violations of prison policies and state and federal laws. The United States and BOP were also negligent in the hiring, supervision, and retention of both associate warden Garcia and CO Klinger.

For all these reasons, ████████ files a claim for her substantial damages with the USA. She has suffered and continues to suffer severe and permanent injuries, mental anguish, embarrassment, humiliation, pain, distress, and damages. She therefore seeks $5,000,000 in compensation for these damages.

# EXHIBIT B

# EXHIBIT B



U.S. Department of Justice

Federal Bureau of Prisons

Western Regional Office
7338 Shoreline Drive
Stockton, California 95219

DEC 07 2021

Jessica Pride, Esq.
The Pride Law Firm
2831 Camino Del Rio S.
Ste. 104
San Diego, CA 92108

RE:  ███████████████ Register Number ███████████
     Administrative Claim No. TRT-WXR-2022-01182
     Received: November 23, 2021

Dear Ms. Pride:

This is to acknowledge the Claim for Damage, Injury or Death submitted or forwarded to this office under the provisions of the Federal Tort Claims Act, 28 U.S.C. §§ 2671, et seq.   In this claim, you seek compensation on behalf of ████████████ for personal injury from April 2020 to October 2020.

In accordance with the applicable provisions of the statute, this agency has up to six months from the date received in which to make a final determination of your administrative claim for damages. This time frame began on the date that your claim was received for filing and processing as noted above.

Title 28, Code of Federal Regulations, § 14.2 (a) provides that an administrative claim presented to a federal agency must be accompanied by evidence of that individual's authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian, or other representative. That evidence may be in the form of letters testamentary, orders from a court of competent jurisdiction, etc. Evidence of your representation, along with ███████████████authority to present the claim is needed. Please submit the requested documentation to the above address and include the claim number.

Sincerely,

DENNIS M. WONG
WESTERN REGIONAL COUNSEL

Dominic Ayotte
Deputy Regional Counsel/CLC Supervisor